IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TORI RENAE MARTIN,

              Plaintiff,

     v.

CAROLYN W. COLVIN,
Commissioner of Social Security,

            Defendant.

Case No. 3:14-cv-01603-SB

**FINDINGS AND
RECOMMENDATION**

---

**BECKERMAN, Magistrate Judge.**

Tori Martin ("Martin") appeals the Commissioner of Social Security's ("Commissioner")
final decision denying her application for Social Security disability insurance benefits under Title
II of the Social Security Act, 42 U.S.C. §§ 401-34. The Court has jurisdiction to hear this appeal
pursuant to 42 U.S.C. § 405(g). For the reasons explained below, the Court recommends that the
district judge affirm the Commissioner's decision on the ground that it is supported by substantial
evidence.

Page 1 - FINDINGS AND RECOMMENDATION

## I. FACTS AND PROCEDURAL HISTORY

Martin was born on February 17, 1980, making her twenty-nine years old on October 1, 2009, the alleged disability onset date. Martin has a high school education, and completed some college course work in the mid-2000s. Her past relevant work includes time as a sales representative and distribution representative. Martin filed an application for disability insurance benefits on January 4, 2011, claiming she is unable to work due primarily to fibromyalgia, migraines, and chronic fatigue syndrome. (Tr. 16, 42, 51.) At the time of her administrative hearing, described more fully below, Martin stood five-feet, two-inches tall, weighed approximately 165 pounds, lived in a house with her husband and four children, ranging in ages from three to thirteen, and cared for her youngest child on a daily basis.

On September 1, 2009, less than a month before Martin's alleged disability onset date, Dr. Houman Sabahi ("Dr. Sabahi") observed that a Magnetic Resonance Imaging ("MRI") of Martin's lumbar spine showed "[v]ery minimal . . . degenerative retrolisthesis of L5 noted over S1." (Tr. 277.) Dr. Sabahi's diagnostic impression was "[f]ocally advanced degenerative discogenic disease at L5-S1 without evidence for disc protrusions or extrusions or other significant neural compromise." (Tr. 277.) Approximately two weeks later, on September 13, 2009, Martin gave birth to her youngest child.

On March 2, 2010, Martin was seen by Jean Danforth ("Danforth"), a nurse practitioner at Baxter Family Medicine. Martin reported that her "primary concern" was hypothyroidism, but also noted side effects (weight gain, "a general sense of fluid retention," and excessive thirst) associated with a recent change in her medication. (Tr. 294.) Although lab results proved to be unremarkable, Martin continued to complain of medication-related side effects. Martin also reported experiencing

"profound daytime fatigue." (Tr. 293.) When Martin's fatigue symptoms persisted, and she began "researching as to the possible cause," Danforth and Martin "briefly discussed the possibility of chronic fatigue syndrome [versus] fibromyalgia." (Tr. 291-92.) Danforth noted that Martin had gained weight, "[d]espite her report of being extremely physically active and regular exercise." (Tr. 291.)

On October 5, 2010, Martin presented for an electrodiagnostic evaluation with Dr. Garrett Marshall ("Dr. Marshall"). Martin reported experiencing intermittent lower back pain stemming from an injury sustained in 2005, which had "increased dramatically" since the birth of her last child. (Tr. 279.) Martin also reported that she was "now having pain with bending, twisting, lifting, and shoveling." (Tr. 279.) Dr. Marshall noted that x-rays and an MRI of the lumbar spine showed "L5/S1 disc space narrowing and facet sclerosis." (Tr. 279.) Dr. Marshall's diagnostic impressions included mild peripheral neuropathy, "no evidence of acute motor radiculopathy [at] L4-S1 on the right [side]," and "sensory radiculopathy cannot be confirmed or excluded with [the] type of testing [administered]." (Tr. 280.) Dr. Marshall had also previously diagnosed Martin with "L5/S1 [d]egenerative disc disease," citing an MRI that revealed "extensive L5/S1 disc degeneration with mild face arthropathy." (Tr. 288.)

On October 22, 2010, Martin presented for a rheumatology consultation with Dr. James Nakashima ("Dr. Nakashima"). Martin informed Dr. Nakashima that she does not experience "pain on a regular basis," but she does experience "some achiness in her upper back, shoulder, [and] neck region." (Tr. 345.) Dr. Nakashima's diagnostic impressions were that Martin suffered from chronic fatigue syndrome, and "[p]ossible fibromyalgia[.]" (Tr. 346.) In terms of a treatment plan, Dr. Nakashima advised Martin to stretch and initiate an exercise program "starting [at] about [five]

minutes three times a week, and adding [one to two] minutes every [two to four] weeks." (Tr. 347.)
Dr. Nakashima provided Martin with a prescription for Cymbalta, as she requested, but advised
Martin that the medication may cause "nausea, headaches, dizziness, [and] possible suicidal
ideations." (Tr. 347.)

Martin presented for a follow-up visit with Dr. Nakashima on November 29, 2010. Martin
complained of continued fatigue, back discomfort, and depression that was "improving." (Tr. 343.)
Martin reported that she had been exercising and experienced occasional headaches. Dr. Nakashima
advised Martin to continue taking Cymbalta and exercising, and to report back to his office in four
to six months.

During a follow-up visit with Dr. Nakashima on February 8, 2011, Martin reported that she
continued to experience pain in her lower back and that she was no longer exercising on a regular
basis, but would occasionally ride a stationary bike. Dr. Nakashima's diagnostic impressions were
fibromyalgia and "[b]ack pain with degenerative disc disease," but he made no reference to chronic
fatigue syndrome.[1] (Tr. 341-42.) Dr. Nakashima continued to encourage Martin to engage in regular
exercise. (Tr. 341-42.)

Martin completed an Adult Function Report on March 29, 2011, in support of her application
for disability insurance benefits. Martin testified that her impairments (i.e., fibromyalgia, chronic
fatigue syndrome, headaches, irritable bowl syndrome, arthritis, and degenerative disc disease)
negatively impact her memory and ability to move about, manipulate objects, focus, stay on task, lift

---

[1] During his initial evaluation, Dr. Nakashima opined that Martin suffered from chronic
fatigue syndrome and "possible" fibromyalgia. (Tr. 346.) The record suggests that Dr. Nakashima
later determined that the etiology of Martin's fatigue was fibromyalgia: "Does the patient suffer from
fatigue for which there is a reasonable medical basis? YES __✓__ NO ____ Please describe:
Fibromyalgia." (Tr. 362.)

heavy objects, stand for extended periods of time, tend to her personal needs, complete house and yard work, squat, bend, reach, walk, sit, kneel, talk, hear, climb stairs, and get along with others. Martin described her typical day as consisting of waking three of her children up for school, eating breakfast and taking her pain medication, laying on the couch for several hours, feeding her youngest child breakfast before he plays and watches cartoons, attempting to do laundry, soaking in a hot bath, attempting to exercise (e.g., riding a stationary bike) with an emphasis on "stretching" and "tightening core muscles," preparing a "simple dinner" for the family, and taking muscle relaxers before bed. (Tr. 188.) Martin added that she is capable of caring for her youngest child, preparing dinner four days a week, dusting, loading the dishwasher, providing food and water to her animals, driving a car, shopping, paying bills, counting change, handling a saving account, using a checkbook, and using a computer.

On April 4, 2011, Corrinne Mahaffey ("Mahaffey") completed a Third-Party Adult Function Report, in support of her daughter's application for disability insurance benefits. Mahaffey noted that Martin experiences muscle aches and lower back problems that limit her ability to maintain focus, stand, or bend at the waist. Mahaffey described her daughter's typical day as consisting of cooking, cleaning, bathing her kids, and feeding her dogs. Mahaffey further testified that her daughter does not experience any problems in terms of personal care (getting dressed, bathing, caring for her hair, shaving, feeding herself, using the toilet, etc.), and she is capable of preparing meals on a daily basis, cleaning, doing laundry, caring for her four children, shopping on a weekly basis, handling money, and attending school events on a regular basis. Mahaffey added that Martin's pain impacts her memory and ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, concentrate, and use her hands.

Page 5 - FINDINGS AND RECOMMENDATION

On April 6 and 21, 2011, Martin visited Dr. Thomas Duncan ("Dr. Duncan"), a doctor at The Lower Columbia Clinic. Martin informed Dr. Duncan that she believed she had "some kind of thyroid disease," feared that she had multiple sclerosis, and "recently . . . ha[d] been having headaches for about [five weeks], increasing weakness and fatigue, and pain in her upper back, neck, and across her shoulders." (Tr. 313-14.) Dr. Thomas noted that Martin had "no overt signs of thyroid disease," and that Martin's history and physical examination suggested that she did not have multiple sclerosis. (Tr. 313-14.)

Martin presented for a follow-up visit with Dr. Nakashima on June 14, 2011. Dr. Nakashima noted that Martin's prescription for Cymbalta had been discontinued, and that the combination of Wellbutrin and Neurontin appeared to be helping Martin. Dr. Nakashima's diagnostic impressions were fibromyalgia and degenerative disc disease. (Tr. 339-40.) At the conclusion of the consultation, Dr. Nakashima again counseled Martin "on [an] exercise program as well as mental exercises." (Tr. 340.)

On June 7, 2011, Dr. Paul Rethinger ("Dr. Rethinger"), a non-examining state agency psychologist, completed a psychiatric review technique assessment, wherein he evaluated Martin's impairments under listing 12.04 (affective disorders).[2] Dr. Rethinger concluded that the limitations imposed by Martin's impairments failed to satisfy listing 12.04. Dr. Rethinger noted that Martin had not experienced any restriction of activities of daily living, difficulties in maintaining social functioning or concentration, persistence, or pace, or repeated episodes of decompensation of an extended duration.

---

[2] The Listing of Impairments is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, and described at 20 C.F.R. §§ 404.1525, 404.1526, 416.925, 416.926.

On June 13, 2011, Dr. Leslie Arnold ("Dr. Arnold"), a non-examining state agency physician, completed a physical residual functional capacity assessment. Dr Arnold concluded that Martin (1) could lift and carry fifty pounds occasionally and twenty-five pounds frequently; (2) could stand, walk, and sit about six hours in an eight-hour workday; (3) could push and/or pull in accordance with the lift and carry restriction; and (4) had no postural, manipulative, visual, communicative, or environmental limitations.

On June 28, 2011, Martin presented for a neurological consultation with Dr. Leon Marshall ("Dr. Marshall").[3] Martin's chief complaints were "derealization cognition, fatigue [and] pain." (Tr. 325.) Based on his examination and review of "[e]xtensive office notes," Dr. Marshall's diagnostic impressions were as follows: (1) a "[c]ompletely normal" neurological examination "without any focal or lateralizing features," and (2) "[l]ikely anxiety/depression with somatization rule out less likely thrombus partial seizure activity . . . [g]iven the extremely long duration of symptoms." (Tr. 326.)

Martin underwent an MRI scan of her brain on July 7, 2011. Dr. William Armington ("Dr. Armington") concluded that the MRI was normal, but noted the presence of "[m]ucous retention cyst within the right maxillary sinus." (Tr. 333.)

---

[3] A doctor of osteopathic medicine, such as Dr. Marshall, is an acceptable medical source under the Social Security regulations. *See Gonzales v. Colvin*, No. 13–1421, 2014 WL 4656470, at *3 n.3 (C.D. Cal. Sept. 17, 2014). "Osteopathy adheres to the principle that a patient's history of illness and physical trauma are written into the body's structure. Osteopathic physicians therefore complete additional training in the study of hands-on manual medicine and the body's musculoskeletal system to permit them to feel (palpitate) the patient's living anatomy (the flow of fluids, motion and texture of tissues, and structural makeup)." *Id.* (internal citation and quotation marks omitted).

Page 7 - FINDINGS AND RECOMMENDATION

Martin visited Dr. Nakashima on August 3, 2011, complaining of continued fibromyalgia-related pain that Martin rated as a seven on a ten-point scale. Martin reported that she had a "[s]ignificant flare after hiking." (Tr. 337.) An examination revealed that Martin had difficulty standing from a seated position, and Dr. Nakashima advised Martin to continue her exercise program.

Martin had a follow-up visit with Dr. Nakashima on September 19, 2011. Martin informed Dr. Nakashima that she had experienced "some improvement," that she continued "to do her farm work," and that she walked on a daily basis for an unspecified period of time but was not otherwise exercising on a regular basis. (Tr. 335.) Dr. Nakashima once again "stressed [the] need[] for a regimen of exercises." (Tr. 336.)

On December 12, 2011, Dr. Martin Kehrli, a non-examining state agency physician, completed a physical residual functional capacity assessment. Dr Kehrli concluded that Martin (1) could lift and carry twenty pounds occasionally and ten pounds frequently; (2) could stand, walk, and sit about six hours in an eight-hour workday; (3) could push and/or pull in accordance with the lift and carry restriction; (4) could occasionally stoop and frequently balance, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds (postural limitations); and (5) had no manipulative, visual, communicative, or environmental limitations.

On December 13, 2011, Dr. Sandra Lundblad ("Dr. Lundblad"), a non-examining state agency psychologist, completed a psychiatric review technique assessment, wherein she evaluated Martin's impairments under listing 12.04 (affective disorders). Dr. Lundblad concluded that the limitations imposed by Martin's impairments failed to satisfy listing 12.04. Dr. Lundblad noted that Martin had not experienced any restriction of activities of daily living, difficulties in maintaining

social functioning or concentration, persistence, or pace, or repeated episodes of decompensation of an extended duration.

On February 10, 2012, Dr. Nakashima prepared a medical source statement. In his statement, Dr. Nakashima opined that Martin could sit for up to four hours during an eight-hour workday; could stand/walk for up to two hours during an eight-hour workday; could not be expected to "use [her] hands adequately" in regards to simple grasping and pushing and pulling; could not be expected to use her hands or feet adequately in regards to repetitive motion tasks, such as writing, typing, and assembly; could occasionally lift and carry ten pounds, climb, balance, and reach above shoulder level; cannot lift or carry weight in excess of ten pounds, stoop, kneel, crouch, or crawl; and experiences moderate difficulties in maintaining attention and concentration due to fibromyalgia-related pain. (Tr. 361-64.)

Martin presented for a follow-up visit with Dr. Nakashima on February 27, 2012. Martin reported that she was "doing better" overall, but continued "to have intermittent nausea with and without her migraine headaches." (Tr. 359.) Martin also reported that Savella had "helped much more than other medications" in treating her fibromyalgia-related pain. (Tr. 359.) Dr. Nakashima advised Martin "to continue her exercise program," and stated that he would like to "see [Martin] back in a year." (Tr. 360.)

On April 24, 2012, Dr. Sabahi noted that an x-ray of Martin's cervical spine was negative. Dr. Sabahi added: "There is good alignment without subluxation. No fractures or other acute bony findings. No Disc space anomalies. No prevertebral soft tissue swelling. No arthritic changes." (Tr. 369.)

An administrative law judge ("ALJ") convened a hearing on April 26, 2012, at which Martin testified about the physical and mental limitations resulting from her impairments. Martin testified that she is unable to work because of "fatigue and pain," and because she vomits "four [to] five days out of the week" due to headaches. (Tr. 51.) Martin added that she needs "to lay down most of the time" due to her pain and fatigue. (Tr. 53.) When asked to explain how she is able to care for a three-year-old child, Martin stated that she has "kind of a routine" where she feeds her son breakfast in the morning, and then he "does his thing and watches cartons" while Martin lays on the couch. (Tr. 53-54.) In terms of school-related events, household chores, and daily activities, Martin acknowledged that she is capable of attending parent-teacher conferences, doing laundry, preparing simple dinners (e.g., macaroni and cheese), visiting with friends and family, and going on a monthly date night with her husband.

The ALJ posed a series of questions to a vocational expert ("VE") who testified at Martin's hearing. The ALJ first asked the VE to assume that a hypothetical worker of Martin's age, education, and work experience could perform a full range of light work, subject to the following limitations: the hypothetical worker could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and should avoid even moderate exposure to workplace hazards. The VE testified that the hypothetical worker could perform Martin's past relevant work as a distribution representative and sales representative, and could also be employed as a general office clerk (DOT 209-562-010), and food assembler (DOT 319.484-010). The VE further testified that there were 49,000 general office clerk and 34,000 food assembler jobs available in the national economy.

The ALJ next asked the VE to assume that the hypothetical worker described above could only stand or walk for up to two hours during an eight-hour workday. The VE testified that the hypothetical worker could still be employed as a distribution representative, general office clerk, or food assembler. Responding to the ALJ's third and fourth hypotheticals, the VE further testified that the hypothetical worker could not sustain competitive employment, if she needed to be absent from work two to three times per month, or needed three additional twenty-minute breaks during the workday. Finally, the VE confirmed that his testimony was consistent with the Dictionary of Occupational Titles.

On June 4, 2012, Martin was evaluated by Carrie McLaughlin ("McLaughlin"), a family nurse practitioner at the Oregon Health and Sciences University Fibromyalgia Clinic. Martin reported that she experiences significant fibromyalgia-related pain, she rides a stationary bike "3+x/weekly" for sixty minutes, and her health and finances were "overwhelming stressors." (Tr. 376.) McLaughlin determined that Martin "suffers from symptoms of moderate fibromyalgia complicated by chronic fatigue," but noted that she was concerned Martin "may be attempting to treat her fatigue with inappropriate medications." (Tr. 379.) McLaughlin recommended, *inter alia*, that Martin receive steroid injections that could "easily" treat her trochanteric bursitis, undergo a trial of fibromyalgia muscle trigger point injections that have been "found to be useful in controlling the pain," and participate in a daily exercise program (e.g., stretching exercises, yoga, water aerobics, and tai chi). (Tr. 380.)

In mid-November 2012, Martin underwent an esophagram and received an ultrasound of her abdomen, based on complaints of nausea and vomiting. The esophagram revealed no demonstrable abnormalities, and the ultrasound revealed that the spleen was "unremarkable in appearance," there

was "no evidence of hydronephrosis or cortical abnormality involving either kidney," the "pancreas, abdominal aorta and inferior vena cava [were] unremarkable in appearance," the gallbladder had been surgically removed, and "no focal cystic or solid lesions [were] seen within the [liver]." (Tr. 408-09.)

On November 23, 2012, Martin was seen by Dr. Estin Yang ("Dr. Yang"), a physician at UrgentCare NW Astoria, PC. Martin complained of nausea and vomiting, and reported that she had "been seen by [more than thirty] doctors [and] specialists for workup of this [problem], without a clear diagnosis." (Tr. 393.) Martin informed Dr. Yang that her nausea and vomiting may have been due to the fact that she "'overdid it' yesterday with [T]hanksgiving [and] also with Black Friday activities." (Tr. 393.) Dr. Yang provided Martin with an injection of Promethazine to help control her nausea.

In a written decision issued on May 19, 2013, the ALJ applied the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a)(4), and found that Martin was not disabled. *See infra* Part II.A-B. The Social Security Administration Appeals Council denied Martin's petition for review, making the ALJ's decision the Commissioner's final decision. Martin timely appealed to this court.

## II. THE FIVE-STEP SEQUENTIAL PROCESS

### A.    Legal Standard

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining

whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are as follows:

> (1) Is the claimant presently working in a substantially gainful activity? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal [one of the listed impairments]? (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Id.* at 724-25. The claimant bears the burden of proof for the first four steps in the process. *Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of the first four steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

**B.      The ALJ's Decision**

At the first step of the five-step sequential evaluation process, the ALJ found that Martin had not engaged "in substantial gainful activity during the period from her alleged onset date of October 1, 2009 through her date last insured of March 31, 2013."[4] (Tr. 18.) At the second step, the ALJ

---

[4] "To be eligible for disability insurance benefits under Title II, a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 1:07–cv–01016, 2008 WL 4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Quarters of coverage are accumulated based upon a worker's earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty quarter period to maintain insured

found that "[t]hrough the date last insured, [Martin] had the following severe impairments: fibromyalgia, degenerative disc disease of the lumber spine, headache[s], obesity, and trochanteric bursitis."[5] (Tr. 18.)

At the third step, the ALJ found that Martin's combination of impairments was not the equivalent of those on the Listing of Impairments. The ALJ then assessed Martin's residual functional capacity ("RFC") and found that she could perform light work as defined under 20 C.F.R. § 404.1567(b), subject to the following modifications: (1) she can stand/walk for a total of two hours in an eight-hour workday; (2) she can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs; (3) she can occasionally balance, kneel, crouch, crawl, and stoop; and (4) she must avoid even moderate exposure to workplace hazards, such as heavy machinery and unprotected heights.

At the fourth step, the ALJ concluded that Martin was capable of performing past relevant work as a distribution representative, as the position did not require Martin to perform any work-related activities that were precluded by her RFC. Although the ALJ's step-four finding was sufficient to conclude that benefits should be denied, the ALJ proceeded to the fifth step and found, as an alternative reason to deny Martin's application for disability insurance benefits, that there were other jobs existing in significant numbers in the national economy that Martin could perform, such

---

status]. . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.' " *Id*. (internal citations omitted). Thus, Martin's date last insured of March 31, 2013, reflects when her insured status terminated based on the prior accumulation of quarters of coverage.

[5] "[O]nly disabilities existing before [the] date last insured establish entitlement to disability insurance benefits." *Sam v. Astrue*, 550 F.3d 808, 810 (9th Cir. 2008) (citing *Vincent v. Heckler*, 739 F.2d 1393, 1394 (9th Cir. 1984) (per curiam)).

as a general office clerk (DOT 209.562-010) and food assembler (DOT 319.484-010). Based on these findings, the ALJ concluded that Martin was not disabled, as defined under the Social Security Act, "from October 1, 2009, the alleged onset date, through March 31, 2013, the date last insured." (Tr. 30.)

### III. STANDARD OF REVIEW

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing both the evidence that supports the Commissioner's conclusions, and the evidence that detracts from those conclusions. *Id.* However, if the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

///

///

Page 15 - FINDINGS AND RECOMMENDATION

## IV. DISCUSSION

In this appeal, Martin argues that the ALJ erred by (1) failing to offer specific, clear, and convincing reasons for discrediting her subjective symptom testimony; (2) failing to offer specific and legitimate reasons for assigning little weight to Dr. Nakashima's medical source statement, (3) silently disregarding Nurse McLaughlin's opinion, (4) failing to include chronic fatigue syndrome as a severe impairment at step two of the sequential analysis, (5) failing to consider at step three whether the combined effects of her chronic fatigue syndrome and fibromyalgia meet or equal a listed impairment, (6) not including all of her limitations in the RFC assessment, (7) determining that she was capable of performing light work, and (8) failing to ask the VE to explain an apparent departure from the Dictionary of Occupational Titles.

## A.    The ALJ Did Not Err in Discrediting Martin's Symptom Testimony.

### 1.    Applicable Law

In the Ninth Circuit, absent an express finding of malingering, an ALJ must provide specific, clear, and convincing reasons for rejecting a claimant's testimony:

> Without affirmative evidence showing that the claimant is malingering, the [ALJ]'s reasons for rejecting the claimant's testimony must be clear and convincing. If an ALJ finds that a claimant's testimony relating to the intensity of his pain and other limitations is unreliable, the ALJ must make a credibility determination citing the reasons why the testimony is unpersuasive. The ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints.

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 (9th Cir. 1999) (citations omitted). Clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her testimony and her conduct, daily activities inconsistent with the

alleged symptoms, and testimony from physicians and third parties about the nature, severity and

effect of the symptoms complained of." *Bowers v. Astrue*, No. 6:11–cv–583–SI, 2012 WL 2401642,

at *9 (D. Or. June 25, 2012); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) ("[T]he

ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would

be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" (quoting *Fair v.*

*Bowen*, 885 F.2d 597, 603 (9th Cir. 1989))).

In assessing a claimant's credibility, an ALJ may also consider (1) "ordinary techniques of

credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements

concerning the symptoms, and other testimony by the claimant that appears less than candid," and

(2) "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course

of treatment[.]" *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). If the ALJ's credibility

finding is supported by substantial evidence in the record, district courts may not engage in

second-guessing. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citing *Morgan*, 169 F.3d

at 600).

## 2.    Application of Law to Fact

There is no affirmative evidence showing that Martin is malingering and, therefore, the ALJ

was required to provide specific, clear, and convincing reasons in support of his adverse credibility

determination. As explained below, the Court concludes that the ALJ provided specific, clear, and

convincing reasons for rejecting Martin's testimony.

The ALJ rejected Martin's testimony on the ground that her "daily functioning and other

reported activities are inconsistent with allegations of disability." (Tr. 26.) "Engaging in daily

activities that are incompatible with the severity of symptoms alleged can support an adverse

Page 17 - FINDINGS AND RECOMMENDATION

credibility determination." *Ghanim v. Colvin*, 763 F.3d 1154, 1165 (9th Cir. 2014). It was reasonable for the ALJ to conclude that Martin's reported activities, which included caring for her three-year-old son without assistance during the school day, riding a stationary bike at least three times a week for up to sixty minutes, preparing meals, attending parent-teacher conferences, doing the laundry, and grocery shopping, undermined her claim of disability. Indeed, during the hearing, Martin testified that she spends "most of her time at home lying down because of fatigue and pain," and that she only spends about one hour per day "getting up [and] doing stuff[.]" (Tr. 23, 67-68.) Her ability to engage in the above activities, coupled with reports of "being extremely physically active and regular exercise" (Tr. 291), casts serious doubt on the degree of limitation described by Martin in her application and at the hearing.[6] This Court finds that it was reasonable for the ALJ to conclude that Martin's claim of disability was inconsistent with her reported activities. *See Smith v. Comm'r of Soc. Sec. Admin.*, 611 F. App'x 897, 900 (9th Cir. 2015) (affirming adverse credibility determination where the claimant's claim of disability was contradicted by her own description of helping to care for her own children); *Thebo v. Astrue*, 436 F. App'x 774, 775 (9th Cir. 2011) (affirming adverse credibility determination where the claimant's daily activities, which included taking care of children, doing laundry, preparing meals, and grocery shopping, conflicted with his disability claim); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (affirming adverse credibility determination where the claimant's disability claim was undermined by her own testimony about her daily

---

[6] The ALJ did not rely explicitly on Martin's reports of being "extremely physically active" and engaging in regular exercise. Nevertheless, it is appropriate for the Court to consider additional support for a ground on which the ALJ relied. *See Fenton v. Colvin*, No. 6:14-00350-SI, 2015 WL 3464072, at *1 (D. Or. June 1, 2015) ("The Court is not permitted to affirm the Commissioner on a ground upon which the Commissioner did not rely, but the Court is permitted to consider additional support for a ground on which the ALJ relied.").

Page 18 - FINDINGS AND RECOMMENDATION

activities, "such as attending to the needs of her two young children, cooking, housekeeping, laundry, [and] shopping"); *Morgan*, 169 F.3d at 600 (affirming adverse credibility determination where the claim of disability was contradicted by the claimant's ability to "prepare meals, do laundry, work in the yard, and occasionally care for his friend's child").

The ALJ also discounted Martin's testimony because more recent treatment and exam records "document[ed] reports of improved symptoms and function." (Tr. 25.) Treatment notes that include signs of improvement can support an adverse credibility determination. *See Hadnot v. Astrue*, 371 F. App'x 875, 877 (9th Cir. 2010) ("The ALJ found additional evidence supporting the finding that claimant was not entirely credible. For example, claimant stated that she received little improvement from surgery, but the medical evidence indicated otherwise."); *Cadena v. Astrue*, 365 F. App'x 777, 780 (9th Cir. 2010) (concluding that the ALJ provided clear and convincing reasons for discounting the claimant's testimony, which was undermined by, *inter alia*, treatment notes that "included signs of improvement"). Here, the ALJ pointed to Martin's report to Dr. Nakashima in February 2012, that she was "doing better" overall, and that Savella "had helped much more than other medications" in treating her fibromyalgia. (Tr. 25, 359.) The ALJ then noted, as evidence of Martin's improved symptoms and functionality, Dr. Nakashima's recommendation to continue exercising and follow-up in one year, and Martin's June 2012 report of riding a stationary bike at least three times per week for sixty minutes. The ALJ also noted McLaughlin's suggestion that Martin's fibromyalgia might continue to improve if she stopped treating her fatigue with "inappropriate medications." (Tr. 25, 379.)

Martin suggests the ALJ merely picked out a few isolated instances of improvement as a basis for discrediting her subjective symptom testimony, while failing to consider the fact that her

Page 19 - FINDINGS AND RECOMMENDATION

fibromyalgia symptoms waxed and waned in the course of treatment. (*But cf.* Tr. 187, "I am always hurting.") It is true that "[a]n ALJ may not single out moments of good health to discredit a claimant, especially in cases involving mental impairments, which often present episodically." *Delegans v. Colvin*, 584 F. App'x 328, 331 (9th Cir. 2014). In this case, however, the ALJ's interpretation of the longitudinal record is a reasonable one, and it is not the Court's role to second-guess it. *See Rollins*, 261 F.3d at 857 ("[T]he ALJ's interpretation . . . may not be the only reasonable one. But it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it."). To be sure, during her initial rheumatology consultation on October 22, 2010, Martin reported that she "ha[d] a poor tolerance for activity," Dr. Nakashima noted the presence of "[p]ossible fibromyalgia," and Dr. Nakashima advised Martin "to initiate [an] exercise program starting about [five] minutes three times a week, and adding [one to two] minutes every [two to four] weeks." (Tr. 345-47.) By June 2012, Martin was riding a stationary bike at least three times per week for sixty minutes. (Tr. 376.) Thus, it was reasonable for the ALJ to conclude that Martin's condition was improving.

The ALJ also "properly considered the lack of medical evidence corroborating [Martin]'s testimony as one factor in his credibility determination." *Nikitchuk v. Astrue*, 240 F. App'x 740, 742 (9th Cir. 2007); *see also Rollins*, 261 F.3d at 857 ("While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."). Martin claims that she is unable to work based, in part, on "[m]igraine like headaches," and severe degenerative disc disease and associated pain that is "so bad [she cannot] stand, sit, or walk for very long." (Tr. 177-78.) The ALJ noted the lack of objective medical evidence

corroborating Martin's complaints of debilitating disc disease and migraine-like headaches: "[T]here is no evidence of disc protusions or extrusions or other significant neural compromise. Further, July 2011 brain MRI and [electroencephalogram] studies for headaches were both 'completely normal' . . . [and a] study for back pain showed only mild peripheral neuropathy but [was] otherwise normal." (Tr. 24.)

Martin contends that, while "these reasons are specific, they are not convincing, for they are not germane to [fibromyalgia] and [chronic fatigue syndrome], the impairments that disable Martin." (Pl.'s Br. at 17.) Martin also points out that fibromyalgia and chronic fatigue syndrome "exist without objective findings." (Pl.'s Br. at 17.) The Court is not persuaded by Martin's argument for two reasons. First, Martin fails to give due consideration to the fact that fibromyalgia and chronic fatigue symptom are not the only impairments that she contends negatively impact her ability to work; rather, Martin also relies on the presence of severe degenerative disc disease and migraine-like headaches. (Tr. 177-78, 187.) Thus, it was appropriate for the ALJ to consider whether the medical evidence corroborated Martin's testimony regarding the severity of these conditions. Second, even assuming the ALJ erred in suggesting that medical evidence detracted from the severity of Martin's fibromyalgia and chronic fatigue syndrome, her daily activities and improved symptoms alone were clear and convincing reasons for discounting the severity of those conditions. Thus, any error was harmless.

Based on the foregoing analysis, the Court concludes that the ALJ's credibility determination should be upheld because it is supported by substantial evidence.

///

///

**B.      The ALJ Did Not Err in Evaluating Dr. Nakashima and Nurse McLaughlin's Opinions.**

**1.      Applicable Law**

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). In the event "a treating or examining physician's opinion is contradicted by another doctor, the '[ALJ] must determine credibility and resolve the conflict.'" *Id.* (quoting *Thomas*, 278 F.3d at 956-57). "An ALJ may only reject a treating physician's contradicted opinions by providing 'specific and legitimate reasons that are supported by substantial evidence.'" *Ghanim*, 763 F.3d at 1161 (citation omitted).

"An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Merely stating conclusions, however, is insufficient: "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Id.* at 1012-13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)).

///

///

### 2.    Dr. Nakashima's Opinion

Martin argues that the ALJ failed to give "specific and legitimate reasons" for discounting Dr. Nakashima's opinion. (Pl.'s Br. at 25.) The Court disagrees.

Specific and legitimate reasons for assigning little or no weight to a treating physician's opinion, or a portion thereof, include "inconsistency with a claimant's testimony," *Townsend v. Astrue*, No. 6:12-cv-00261-SI, 2013 WL 687042, at *4 (D. Or. Feb. 25, 2013) (citing *Andrews*, 53 F.3d at 1043), the fact that "the opinion is conclusory and unsupported by objective medical findings," *Leanos v. Astrue*, No. 11-0068-CW, 2011 WL 4802520, at *4 (C.D. Cal. Oct. 7, 2011), inconsistency "with the physician's own treatment notes," *id*., inconsistency "with the independent opinion of a consulting examiner," *id*., inconsistency "with a non-examining physician's opinion that is itself supported by other record evidence," *id*., and the "absence of regular medical treatment during the alleged period of disability, *Chilcote v. Astrue*, No. 3:12-cv-00421, 2013 WL 2033540, at *5 (D. Or. Apr. 8, 2013).

Here, the ALJ discounted portions of the Physical Capacities Evaluation that Dr. Nakashima completed on February 10, 2012. For example, the ALJ assigned "little weight" to Dr. Nakashima's opinion that Martin suffers from "moderate" difficulties in sustaining attention and concentration, citing a lack of corroborating medical evidence, inconsistency with Martin's "neurological and mental status exams indicating intact memory and no cognitive deficits," and inconsistency with Martin's previously described activities. (Tr. 28, 364.) Martin does not appear to challenge the ALJ's rejection of Dr. Nakashima's opinion regarding attention and concentration deficits. (*See* Pl.'s Br. at 23-25, Pl.'s Reply at 6-7.) Nevertheless, the Court concludes that this finding is supported by substantial evidence, including, but not limited to: (1) Dr. Chad Hagen's opinion that Martin exhibits

"good recall for remote and recent events," "grossly intact" cognition, and good insight and judgment; (2) Drs. Rethinger and Lundblad's opinions that Martin experiences no difficulty in maintaining concentration, persistence, or pace; (3) the fact that Martin's hobbies and interests include Sudoku puzzles, (4) Dr. Marshall's observation that Martin is "alert, attentive, and oriented to person, place, time and circumstance," and (5) Dr. Yang's observation that Martin's judgment and insight were intact, she was oriented to time, place, and person, and her memory was "[i]ntact for recent and remote events." (Tr. 84, 97, 191, 326, 390, 395.) Furthermore, the Court notes that the ALJ found only that Martin could perform semi-skilled work, which is consistent with Dr. Nakashima's opinion that Martin's attention and concentrate deficits would preclude skilled work tasks. (Tr. 76-77, 364.)

The ALJ also assigned "limited weight" to physical limitations found by Dr. Nakashima. The ALJ first noted that Dr. Nakashima estimated that Martin could only lift and carry ten pounds occasionally, stand/walk for up to two hours during an eight-hour workday, and sit for four hours during an eight-hour workday. (Tr. 27.) The ALJ credited Dr. Nakashima's opinion regarding Martin's ability to stand/walk, and included this limitation in Martin's RFC assessment. The ALJ discounted Dr. Nakashima's opinion that Martin could only occasionally lift and carry ten pounds, and sit for four hours during an eight-hour workday. In support of this conclusion, the ALJ stated that Dr. Nakashima examined Martin "only about once per year, and his capacity assessment exceeds the degree of severity reflected in treatment records that show mostly routine and conservative treatment," such as engaging in regular exercise and taking anti-inflammatory medications to control pain. (Tr. 27.)

Page 24 - FINDINGS AND RECOMMENDATION

Martin takes issue with the ALJ's statement that she only saw Dr. Nakashima once per year. Martin argues that the ALJ erred by mischaracterizing the record, and by failing to explain why Martin's "level of contact" detracted from the legitimacy of Dr. Nakashima's medical opinion. (Pl.'s Br. at 24.)

The Court agrees that the ALJ did not choose his words wisely when he stated that Martin only saw Dr. Nakashima "about once per year," as the record makes clear that she visited him more frequently between late 2010 and early 2012. On the previous page of his decision, however, the ALJ explained that Martin "had *recently* seen Dr. Nakashima only once per year[.]" (Tr. 26) (emphasis added). This statement was based on the testimony Martin provided during the hearing held on April 26, 2013: "I went to see [Dr. Nakashima] earlier this year and, that was the first time in a year. Before that I'd probably seen him about, you know, around three times a year or so. It just depends." (Tr. 60.) The foregoing suggests that the ALJ was merely intending to describe the frequency of Martin's more recent visits to Dr. Nakashima's office, not to mischaracterize the record or Martin's testimony.

Even assuming the ALJ erred in characterizing the frequency of Martin's visits with Dr. Nakashima, however, the error was harmless because the ALJ offered another specific and legitimate reason for discounting the opinion—namely, that Dr. Nakashima prescribed only a conservative treatment plan (i.e., exercise and anti-inflammatories). *See Butler v. Colvin*, No. 2:11-cv-2802, 2013 WL 1281777, at *4 (E.D. Cal. Mar. 27, 2013) ("An ALJ may reject the opinion of a treating physician who prescribed conservative treatment, yet opines that a claimant suffers disabling conditions."). The record before the Court supports the ALJ's findings that Martin only received conservative treatment. *See Brackett v. Comm'r of Soc. Sec. Admin.*, 468 F. App'x 754, 754-55 (9th

Cir. 2012) (concluding that the ALJ provided specific and legitimate reasons for rejecting the opinion of a treating physician, and noting that the physician "prescribed only a conservative treatment plan (exercise and diet),which is inconsistent with a finding of permanent total disability"); *see also Miller v. Astrue*, No. 10-cv-01307, 2011 WL 1935833, at *4 (C.D. Cal. May 20, 2011) (explaining that the claimant's treating physician "prescribed conservative treatment of yoga, exercise, and pain medication"); *Penfield v. Colvin*, 563 F. App'x 839, 840 (2d Cir. 2014) (noting that the claimant's treating physician consistently prescribed a "conservative treatment" regimen of walking, stretching, and exercising).

Martin argues that the ALJ never stated that Dr. Nakashima prescribed only conservative treatment, and the Commissioner is attempting to offer an impermissible *post hoc* rationalization. (Pl.'s Reply at 6.) That is incorrect. The ALJ specifically found that "[Dr. Nakashima's] capacity assessment exceeds the degree of severity reflected in treatment records that show mostly routine and *conservative treatment*[.]" (Tr. 27) (emphasis added).

Martin also argues that the ALJ (1) was not "free to prefer" Dr. Kehrli's opinion over Dr. Nakashima's, and (2) ignored the fact that Dr. Nakashima's diagnosis of fibromyalgia and associated fatigue were supported by the findings of Nurse Danforth, Nurse McLaughlin, and Dr. Duncan. (Pl.'s Br. at 25.) Again, the Court disagrees.

First, it true that a "nonexamining medical advisor's testimony does not by itself constitute substantial evidence that warrants a rejection of either the treating doctor's or the examining psychologist's opinion." *Lester*, 81 F.3d at 832. Contrary to Martin's suggestion, however, the ALJ did not rely solely on Dr. Kehrli's opinion in discounting portions of Dr. Nakashima's opinion. Rather, the ALJ pointed to, among other things, the conservative treatment regimen prescribed by

Page 26 - FINDINGS AND RECOMMENDATION

Dr. Nakashima, Martin's reported activities, and neurological and mental status exams. *See generally Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (explaining that the contrary opinion of a non-examining medical expert "may constitute substantial evidence when it is consistent with other independent evidence in the record"). Further, the ALJ actually rejected Dr. Kehrli's opinion regarding Martin's ability to stand or walk for up to six hours during an eight-hour workday, in favor of Dr. Nakashima's opinion that Martin could only stand or walk for only two hours.

Second, it appears to be undisputed that Dr. Nakashima's opinion conflicts with other medical evidence in the record. "The ALJ is responsible for resolving conflicts in the medical record," *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008), and the ALJ did not err in so doing. Contrary to Martin's assertion that the ALJ ignored that other sources corroborated Dr. Nakashima's diagnosis of fibromyalgia, the Court notes that the ALJ actually credited Dr. Nakashima's fibromyalgia diagnosis, by concluding that it was a severe medically determinable impairment at step two of the sequential process.

In summary, the Court concludes that the ALJ provided specific and legitimate reasons for discounting portions of Dr. Nakashima's opinion, and those reasons are supported by substantial evidence.

### 3.    Nurse McLaughlin's Opinion

Next, Martin argues that the ALJ erred by silently disregarding Nurse McLaughlin's opinion. According to Martin, McLaughlin found chronic fatigue syndrome to be Martin's "primary disorder," and an ALJ "must provide some reasoning why he rejects evidence helpful to the claimant, in this instance Nurse McLaughlin's opinion regarding [Martin's chronic fatigue syndrome]." (Pl.'s Reply at 8.)

It is well settled that an "ALJ need only explain why 'significant probative evidence has been rejected.'" *Wallis v. Colvin*, 608 F. App'x 489, 490 (9th Cir. 2015) (citation omitted). In *Coleman v. Colvin*, 524 F. App'x 325 (9th Cir. 2013), for example, the claimant argued that the ALJ erred by failing to specifically address her diagnoses of sleep disorder and chronic pain. *Id*. at 326. The Ninth Circuit rejected the claimant's argument, noting that ALJs are required only to explain why significant probative evidence has been rejected, and holding that "mere diagnoses do not meet this standard." *Id*.

Here, the ALJ did not fail to explain why he rejected significant probative evidence. First, mere diagnoses do not meet the standard of significant probative evidence. *See id.* Second, Nurse McLaughlin did not list chronic fatigue syndrome among her six diagnoses, or refer to it as Martin's "primary disorder." (*See* Tr. 379.) In fact, although Nurse McLaughlin noted that Martin's fibromyalgia was complicated by chronic fatigue, she suggested that Martin's fatigue might improve if she stopped trying to treat it "with inappropriate medications." (Tr. 379.) Finally, Nurse McLaughlin's evaluation form does not specify any functional limitations or work-related restrictions arising from chronic fatigue syndrome, thus precluding any argument that the ALJ discounted such probative evidence. *See, e.g., Houghton v. Comm'r Soc. Sec. Admin.*, 493 F. App'x 843, 845-46 (9th Cir. 2012) ("Houghton has not shown that the ALJ discounted significant probative evidence of functional limitations or work-related restrictions arising from [alleged medical conditions]. The ALJ was not required to discuss these alleged medical conditions in the absence of significant probative evidence that they had some functional impact on Houghton's ability to work.").

For all of these reasons, the Court concludes that the ALJ did not err in his treatment of Nurse McLaughlin's evaluation.

**C.     The ALJ Did Not Err at Steps Two and Three.**

Martin also asserts that the ALJ erred by failing to conclude that Martin's chronic fatigue syndrome was a severe impairment at step two of the sequential process. Martin cites Social Security Rule 14-1p for the proposition that the Commissioner's definition of chronic fatigue syndrome "in-and-of-itself includes a loss of ability to work." (Pl.'s Br. at 26.)

To the extent Martin suggests that a diagnosis of chronic fatigue syndrome is sufficient to establish a severe medically determinable impairment, her argument lacks merit. Social Security Ruling 14-1p "expressly acknowledges that a diagnosis of [chronic fatigue syndrome] is necessary, but not sufficient, to establish a medically determinable impairment." *Bowers v. Colvin*, --- F. App'x ---, 2015 WL 5847413, at *3 n.4 (4th Cir. Oct. 8, 2015). In any event, any alleged error at step two was harmless because step two was decided in Martin's favor with regard to her other impairments. *See Mondragon v. Astrue*, 364 F. App'x 346, 348 (9th Cir. 2010) ("Any alleged error at step two was harmless because step two was decided in [the claimant's] favor with regard to other ailments."); *Tuan Ahn Du v. Astrue*, 475 F. App'x 127, 128 (9th Cir. 2012) ("[The claimant's] argument that the ALJ did not properly consider the combined effect of his impairments fails as to the step two analysis because that step was resolved in [the claimant's] favor.").

Martin argues that the error became prejudicial at step three of the process, because the ALJ failed to consider whether the combination of severe and non-severe impairments, including chronic fatigue syndrome, meet or medically equal a listed impairment. (Pl.'s Reply at 10.) However, Martin fails to meet her burden of demonstrating, or even specifying, what listing she meets or equals.

Accordingly, the Court rejects Martin's argument that the ALJ committed prejudicial error at step three of the sequential process. *See, e.g., Hogle v. Astrue*, No. 09-cv-00129-MAN, 2010 WL 3894621, at *6 (C.D. Cal. Sept. 30, 2010) (concluding that the ALJ did not err in failing to address an impairment at step three where the plaintiff "did not even specify which listing she purportedly met or equaled, much less proffer a theory of how she equaled a listing based on the combination of her impairments").

**E.       The ALJ Did Not Err in Fashioning the RFC.**

Martin argues that the ALJ erred in fashioning the RFC, but her argument is predicated on the arguments set forth above, which the Court has rejected. (*See* Pl.'s Reply at 10) ("Should this court find no harmful error with the ALJ's decision, th[e]n Martin has nothing to say regarding the RFC he arrived at, and accordingly has no argument with defendant's position regarding RFC.") The Court finds that the RFC assessment appropriately accounted for all of Martin's limitations.[7]

**F.       The ALJ Did Not Err in Relying on the VE's Testimony**.

Finally, Martin argues that the jobs identified by the VE are classified as light work under the Dictionary of Occupational Titles, which exceeds her RFC because the ALJ limited her to standing and/or walking for up to two hours during an eight-hour workday. (Pl.'s Br. at 28.) Martin

---

[7] The Court also notes that, contrary to Martin's suggestion in her opening brief, the RFC assessment states that she is capable of performing a modified version of light work, not a full range of light work. *See Elliot v. Comm'r of Soc. Sec.*, 295 F. App'x 507, 508 (3d Cir. 2008) ("[T]he full range of light work requires standing or walking for six hours per day [which] is consistent with [the ALJ's] conclusion that Elliott possessed the RFC to perform light work with modifications, *i.e.*, that he not be required to stand or walk for more than two hours per day."); 20 C.F.R. § 404.1567(b) (stating that "the full range of light work requires standing and walking, off and on, for a total of approximately 6 hours of an 8–hour workday").

further argues that the ALJ erred by failing to obtain a reasonable explanation from the VE regarding the apparent conflict between his testimony and the Dictionary of Occupational Titles.

In *Willrodt v. Astrue*, No. 09-cv-2000, 2010 WL 2850785, at *2 (C.D. Cal. July 19, 2010), as here, the claimant argued that the jobs of sewing machine operator and electronics worker, which were classified as light work under the Dictionary of Occupational Titles, exceeded her RFC limitation of standing and/or walking for two hours per day. *Id*. The claimant further argued that the ALJ erred by failing to obtain a reasonable explanation for the apparent conflict between the Dictionary of Occupation Titles and the VE's testimony. *Id*. In rejecting the claimant's arguments, the *Willrodt* court observed that "not *all* jobs that are classified as 'light work' require standing or walking for six hours in an eight-hour day." *Id*. The court went on to emphasize that, although the Dictionary of Occupational Titles classified the jobs of sewing machine operator and electronics worker as light work, it also defines light work as entailing "'walking or standing to a significant degree,' *or* 'sitting most of the time but entails pushing and/or pulling of arms or leg controls,' *or* 'working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.'" *Id*. In other words, the use of the disjunctive "or" suggested that the jobs of sewing machine operator and electronics worker could be performed in a mostly seated position, and thus the plaintiff failed to show that there was a material conflict with the VE's testimony. *See id*.

As in *Willrodt*, Martin has failed to show that a material conflict exists between the VE's testimony and the Dictionary of Occupational Titles. By way of example, the Court notes that the Dictionary of Occupational Titles classifies the job of general office clerk as "light work," but also describes the job as entailing "walking or standing to a significant degree," "*sitting most of the time*

[with some] pushing and/or pulling of arm or leg controls; and/*or* . . . working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible." General Office Clerk, *DOT* § 209.562–010, *available at* 1991 WL 671792 (emphasis added). Thus, nothing in the Dictionary of Occupational Title's description of general office clerk job requires standing or walking six hours in an eight-hour workday. *See Caballero v. Colvin*, No. 14-1266, 2015 WL 5768376, at *4 (C.D. Cal. Sept. 29, 2015) ("The definition for these jobs goes on to state that . . . the employee is required to: (1) 'walk[ ] or stand[ ] to a significant degree'; (2) sit for the majority of the time while 'pushing and/or pulling of arm or leg controls'; or (3) 'work at a production rate pace entailing the constant pushing and/or pulling of materials.' Thus, nothing in the DOT's description of these positions requires standing or walking six hours in an eight-hour workday. On the contrary, it allows for jobs that involve mostly sitting) (internal citation omitted).

Accordingly, the Court concludes that the ALJ did not err in relying on the VE's statement that his testimony was consistent with the Dictionary of Occupational Titles, or in finding Martin not disabled at step five. *See generally Ratliff v. Colvin*, No. 3:12–cv–02326–HU, 2014 WL 1269505, at *5 (D. Or. Mar. 26, 2015) ("The Commissioner's burden is satisfied by showing the existence of only one job with a significant number of available positions that the claimant can perform.") (citation and ellipses omitted).

### V. CONCLUSION

Based on the foregoing reasons, the Court recommends that the district judge affirm the Commissioner's decision.

## VI. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 9th day of February, 2016.

_____
STACIE F. BECKERMAN
United States Magistrate Judge